# UNITED STATES DISTRICT COURT
for the
## District of New Hampshire

| | |
|---|---|
| KEVIN S. KANG, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:25-cv-00412 |
| GEISEL SCHOOL OF MEDICINE | ) |
| AT DARTMOUTH and TRUSTEES | ) |
| OF DARTMOUTH COLLEGE, | ) **COMPLAINT AND JURY DEMAND** |
| | ) |
| *Defendant.* | ) |

_____

## CIVIL ACTION

*This is a civil rights and contract action brought by Plaintiff Kevin S. Kang, a former top-performing medical student at Dartmouth College's Geisel School of Medicine, who was wrongfully separated from the program one semester before graduation. Despite years of academic excellence and documented disability, Plaintiff was subjected to discriminatory treatment, biased evaluations, and procedural irregularities that culminated in the destruction of his medical career.*

*Plaintiff alleges violations of Title VI of the Civil Rights Act, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and state law claims for breach of contract and promissory estoppel. He seeks compensatory and equitable relief for the loss of his educational opportunity, emotional harm, and the institutional failures that denied him a fair and lawful path to his medical degree.*

COMES NOW, Plaintiff, KEVIN S. KANG (hereafter "Mr. Kang" or "Plaintiff"), by and through his undersigned attorney, and sues Defendants, GEISEL SCHOOL OF MEDICINE AT DARTMOUTH and TRUSTEES OF DARTMOUTH COLLEGE, and in support thereof, shows as follows:

## INTRODUCTION

1.      This is a federal question lawsuit brought under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*. and under state contract law.

2.      Plaintiff, Kevin S. Kang, is a dark-skinned male medical student of North Indian descent who graduated among the top ten Valedictorians and Salutatorians of Dartmouth College in 2018. He was awarded the prestigious Goldwater Scholarship by the United States Congress in 2017 and was offered early admission to Geisel School of Medicine at Dartmouth ("Geisel" or "GSOM") without the need to interview elsewhere. After graduation, he matriculated at Geisel, where he remained in good academic standing until the institution arbitrarily separated him one semester prior to graduation based on his race, color, national origin, and sex.

3.      At all relevant times, Plaintiff had devoted his academic career to Dartmouth College and Geisel, maintaining top academic performance. Following a brief setback due to illness with COVID-19 in early 2021, Plaintiff resumed his studies. During the final months of his fourth year, Assistant Professors Crockett and Billmeier engaged in discriminatory conduct based on Plaintiff's protected characteristics by:

(1) falsely accusing him of "threatening behavior" toward Dr. Billmeier, a white female professor;

(2) treating a white female medical student with demonstrably lower clinical aptitude more favorably;

(3) permitting Dr. Billmeier to author a biased evaluation of Plaintiff's surgery clerkship;

(4) allowing Dr. Billmeier to intentionally withhold a favorable evaluation from the Academic Progress Committee ("APC"); and

(5) depriving Plaintiff of his contractually guaranteed right to procedural due process.

**4.**    As a result of this disparate treatment and the submission of misleading documentation, Geisel summarily expelled Plaintiff, thereby terminating his medical education and causing the damages alleged herein.

## **PARTIES**

5.    At all times relevant hereto, Plaintiff, KEVIN S. KANG, was a resident of Erie, Pennsylvania.

6.    At all times relevant hereto, Defendant Geisel School of Medicine at Dartmouth is an academic division of Dartmouth College, a private postsecondary educational institution located in Hanover, New Hampshire, with the capacity to sue and be sued. Dartmouth College owns and operates Geisel and is responsible for its academic policies, procedures, and governance. At all relevant times, Dartmouth College was a recipient of federal financial assistance, subjecting it to the requirements of Title VI of the Civil Rights Act of 1964 and other federal anti-discrimination statutes.

7.    At all times relevant hereto, defendants, TRUSTEES OF DARTMOUTH COLLEGE, comprise the governing body of Dartmouth College, a private postsecondary "Ivy League" educational institution with the capacity to sue and be sued of which Geisel School of Medicine is an integral part. At all times relevant, Dartmouth College was a recipient of federal financial assistance and other funding.

8.      The offices of Dartmouth College are in Hanover, New Hampshire. It can be served with summons by serving its president, Sian Leah Beilock, at Dartmouth College, Hanover, NH 03755 Parkhurst, Room 206, HB 6001.

9.      Geisel School of Medicine is not a separate legal entity but operates as an academic division of Dartmouth College. All actions taken by faculty, administrators, and committees at Geisel—including Drs. Crockett, Billmeier, Sorensen, and Compton—were undertaken within the scope of their employment and under the authority of the Trustees of Dartmouth College. Accordingly, all allegations herein are asserted against the Trustees of Dartmouth College as the responsible legal entity.

## VENUE AND JURISDICTION

10.     Venue is proper in the United States District Court for the District of New Hampshire pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because, upon information and belief, all Defendants reside in New Hampshire and a substantial part of the events or omissions giving rise to the claims occurred within this District.

11.     This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, including Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq.

12.     This Court also has **supplemental jurisdiction** over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution and arise from a common nucleus of operative fact.

## **GENERAL FACTUAL ALLEGATIONS**

13.    Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

14.    At all times relevant, Plaintiff Kevin S. Kang ("Plaintiff" or "Mr. Kang") was a full-time medical student in good standing at Geisel School of Medicine at Dartmouth ("Geisel" or "GSOM"), pursuing a Doctor of Medicine degree with a focus on surgical training.

15.    Plaintiff matriculated at Geisel in the Summer of 2018, having earned early admission based on his exceptional academic record, including his status as a Goldwater Scholar and top-ranking graduate of Dartmouth College. He timely paid all tuition and fees and successfully completed coursework and clinical clerkships toward graduation.

**16.**    In Spring 2021, Plaintiff contracted COVID-19, which significantly impaired his health and academic performance. As a result, he failed the Shelf Exam component of his core surgery clerkship, despite passing both the Surgical Oncology portion of the core and the Plastics portion of the specialty component.

17.    Although Geisel policy required only remediation of the failed Shelf Exam, Dr. Andrew Crockett, Geisel's Clerkship Director, persuaded Plaintiff to repeat the entire surgery clerkship. Plaintiff agreed, believing it would strengthen his standing in the department and support his intended specialty in surgery. He began the repeat clerkship in Spring 2023.

18.    According to Dr. Dick, Associate Dean of Clinical Education, remediation of a Shelf Exam without repeating the entire clerkship was standard practice, and failing a Shelf Exam was not uncommon. Dr. Dick further acknowledged that, to his knowledge, Plaintiff was the only

student separated from Geisel under such circumstances, despite other students having failed exams or engaged in academic misconduct.

19.    Plaintiff personally observed multiple peers who failed Shelf Exams or entire clerkships and were nonetheless permitted to graduate. He also witnessed students who had been suspended for academic dishonesty later reinstated and allowed to complete their degrees. Plaintiff has never been accused of cheating or any form of academic dishonesty.

20.    On March 16, 2021, Plaintiff underwent a comprehensive psychological evaluation, which diagnosed him with Major Depressive Disorder. He reported symptoms including memory impairment, difficulty concentrating, and diminished academic performance.

21.    Plaintiff formally presented the results of this evaluation and requested reasonable accommodations for his disability during an Academic Progress Committee (APC) hearing in 2023. Geisel leadership refused to accept or act upon the request, denying him the protections afforded under federal disability law.

22.    Plaintiff attempted to present the results of his psychological evaluation and request for reasonable accommodations again during the Academic Progress Committee (APC) hearing held on June 5, 2024, but was once again rebuffed. The committee refused to meaningfully consider his disability-related documentation or provide appropriate accommodations.

23.    Although Plaintiff was granted a limited accommodation allowing him to take the Shelf Exam two weeks later than scheduled, no accommodations were made to inform his clinical preceptors of his diagnosed condition during clerkships, thereby undermining the effectiveness of the accommodation and exposing him to biased evaluations.

24.     In Spring 2023, after recovering from COVID-19, Plaintiff retook the Shelf Exam and scored in the 80th percentile, a marked improvement from his prior score in the 1st percentile while ill. Despite this academic success, Plaintiff failed the Trauma/Acute Care Surgery (ACS) component of the core clerkship. This failure was precipitated by Dr. Andrew Crockett, who informed Plaintiff's preceptors that he was a "problem student" who had previously failed, thereby prejudicing their evaluations and creating personality conflicts. Plaintiff did, however, pass the Orthopedics specialty component of the clerkship.

25.     During the same semester, Geisel's Committee on Student Performance and Conduct (CSPC) was undergoing reorganization and was renamed the Academic Progress Committee (APC). This transition created procedural confusion and administrative omissions.

26.     Due to this confusion, Drs. Crockett and Sorensen failed to properly inform the APC that Plaintiff's repeat of the surgery clerkship was intended solely to remediate the Shelf Exam component. Instead, the APC was led to believe that Plaintiff was remediating the entire clerkship. As part of this miscommunication, Dr. Crockett erroneously assigned Plaintiff a grade of "Incomplete" (I) for the entire clerkship, despite Plaintiff having passed all components except the Shelf Exam in 2021.

27.     As a result of this procedural error, the APC incorrectly concluded that Plaintiff had failed the surgery clerkship twice—once in 2021 and again in 2023—prior to his Minimally Invasive Surgery (MIS) rotation in 2024. In reality, Plaintiff had passed the 2021 clerkship except for the Shelf Exam, which he later remediated successfully. His only actual clerkship failure was the Trauma ACS component in 2023.

28.    On March 12, 2021, Dr. Crockett sent Plaintiff an email acknowledging that Plaintiff had passed the surgery clerkship and only needed to retake the Shelf Exam. However, in the same email, Dr. Crockett also referred to Plaintiff as having "failed" the clerkship—an irreconcilable contradiction that contributed to the confusion and mischaracterization of Plaintiff's academic record.

29.    This procedural error, combined with the prejudicial conduct of Dr. Crockett in labeling Plaintiff a "prior failure" to Trauma ACS preceptors, led to Plaintiff being required to repeat the surgery clerkship yet again in Spring 2024.

30.    In Fall 2022, Plaintiff failed his Pediatrics clerkship based on two negative evaluations. However, a third evaluator, Dr. Lim-Liberty, recommended only "some coaching" and believed Plaintiff should have passed. This recommendation was never considered by the APC due to its ongoing reorganization.

31.    In accordance with Dr. Lim-Liberty's recommendation, Plaintiff completed two weeks of additional clinical work with Drs. Dick, Lim-Liberty, Randhawa, and Del Giudice, receiving excellent evaluations from all four physicians. Dr. Dick explicitly informed Plaintiff that he considered the pediatrics remediation successfully completed.

32.    On April 19, 2023, Dr. Andrew Crockett informed Plaintiff that he had failed his repeat of the surgery clerkship due to his performance in the Trauma/Acute Care Surgery (ACS) component. This failure was directly linked to prejudicial conduct by Dr. Crockett, who had previously mischaracterized Plaintiff to his preceptors as a "problem student."

33.    In June 2023, Plaintiff's Clinical Education Pediatrics clerkship directors confirmed that he had successfully completed all required remediation and had officially passed

the Pediatrics clerkship. However, this fact was either not properly communicated to the APC, or, if communicated, was never acknowledged or recorded by the committee in its deliberations or final decision.

34.    On April 15, 2024, Plaintiff met with Dr. Crockett to discuss his clinical progress while remediating the failed surgery clerkship from Spring 2023. Plaintiff sought clarity on his standing and feedback regarding his performance.

35.    On April 16, 2024, Dr. Crockett emailed Plaintiff a written summary of their meeting. In the email, Dr. Crockett criticized Plaintiff for alleged "unprofessional behavior" during the rotation but made no mention of Plaintiff having failed the clerkship. Notably, Dr. Crockett admitted to Plaintiff that, as he had done previously during the Trauma ACS rotation, he had again preemptively informed Plaintiff's preceptors that Plaintiff was a "prior failure." Dr. Crockett later acknowledged to Plaintiff that this disclosure was inappropriate and had likely biased the preceptors' evaluations.

36.    On April 18, 2024, Dr. Billmeier, Director of the Minimally Invasive Surgery (MIS) clerkship, emailed Plaintiff a written summary of his performance during clinic that day. Her feedback included various criticisms, such as concerns about "presentation organization" and "patient comfort," but did not cite any objective failure or violation of clinical standards.

37.    On April 27, 2024, Plaintiff received an email from Dr. Sorensen, stating that "due to unforeseen circumstances," Dr. Billmeier would be unable to accommodate a student the following week and that Plaintiff would be reassigned to Dr. Trus. Plaintiff later discovered that Dr. Billmeier did, in fact, accommodate a student that week—a white female student named Angel

Moore. Plaintiff, an Indian male of darker complexion, was excluded without explanation, raising serious concerns of disparate treatment based on race and gender.

38.    On April 30, 2024, while attempting to meet with Dr. Trus in the 4C Surgery Division of Geisel, Plaintiff was unexpectedly approached by two security guards and instructed to leave the premises. He was given no prior warning or explanation and ultimately departed without meeting with any faculty.

39.    Subsequently, Dr. Crockett informed Plaintiff that he had allegedly exhibited "threatening behavior" toward Dr. Billmeier during his presence in the 4C department. Dr. Crockett claimed that Dr. Billmeier felt unsafe and required security to escort her home. Plaintiff was thereafter forbidden from entering the Surgery Division offices, which are routinely accessible to medical students.

40.    At This accusation deeply alarmed Plaintiff, who feared for his academic survival at Geisel. He was concerned that being labeled as a security threat and denied access to essential clinical spaces would irreparably damage his standing and ability to complete his medical education.

41.    Following this incident, members of the Surgery Department actively advocated for Plaintiff's separation from Geisel, including making personal appearances at institutional meetings to support his removal.

42.    Plaintiff's presence in the 4C department on April 30 was solely for the purpose of meeting with Drs. Trus and Lamb, both of whom were involved in his clerkship supervision.

43.    On the final day of the clerkship, while speaking with Dr. Lamb, Plaintiff observed Dr. Billmeier standing approximately six feet away, conversing with another individual. She

appeared to be staring at Plaintiff with an unusual facial expression. Plaintiff made no attempt to approach or speak to Dr. Billmeier during this encounter.

44.    At no point before, during, or after the incident did Dr. Billmeier communicate to Plaintiff that she felt threatened by him. Plaintiff only learned of her alleged concerns through Dr. Crockett, after the clerkship had concluded.

45.    Prior to this incident, Plaintiff had never been accused of threatening behavior by any faculty, staff, or student at Dartmouth. The allegation came as a complete shock. Dr. John F. Dick, who was present during the meeting with Plaintiff and Dr. Crockett, remarked, *"This is ridiculous—Kevin is not threatening."*

46.    On the same day as the alleged incident, Dr. Billmeier uploaded her official evaluation of Plaintiff's performance in the Minimally Invasive Surgery (MIS) clerkship. The evaluation was uniformly negative, criticizing every aspect of Plaintiff's clinical performance without any redeeming or constructive feedback. This evaluation became the primary basis for Plaintiff's separation from Geisel.

47.    Notably, Dr. Billmeier had excused herself from working with Plaintiff for the final five days of the short clerkship and failed to respond to his communications. Despite her absence, she submitted a highly prejudicial evaluation that lacked objectivity and fairness.

48.    On May 28, 2024, the Academic Progress Committee (APC) convened a hearing to evaluate Plaintiff's academic and clinical performance. Neither Plaintiff nor his support person, Dr. John F. Dick, were informed that separation from Geisel was a possible or likely outcome of the hearing. Nonetheless, Plaintiff later learned that the APC had voted to separate him from the institution, effectively terminating his medical education.

49.     At the May 28, 2024, APC hearing, Plaintiff was accompanied by Dr. Stephen M. Del Giudice, who later authored a detailed letter criticizing the committee's biased conduct, and by Dr. Lisa Chimienti, who had supported Plaintiff's academic progress and helped him secure a Master of Medical Sciences degree, believing he had been treated unfairly. Also present was Dr. John F. Dick, Associate Dean of Clinical Education, who had arranged for two witnesses prepared to offer detailed and favorable testimony regarding Plaintiff's academic abilities and professional demeanor. However, the APC refused to allow any of these witnesses to speak, and the hearing lasted no more than ten minutes, during which no committee member asked Plaintiff any questions before voting to separate him.

50.     On June 5, 2024, Dr. Chimienti informed Plaintiff for the first time that the APC had voted to separate him from Geisel.

51.     On June 7, 2024, Dr. Del Giudice sent a letter to Dean Compton and Dr. Torrey, stating that although he was present at the May 28 hearing and prepared to offer favorable testimony, the committee neither acknowledged his presence nor permitted him to speak. He concluded that *"Kevin's opportunity before the committee had been compromised because they failed to gather all the pertinent information available to them."*

52.     On June 17, 2024, a new paragraph containing positive feedback regarding Plaintiff's performance during the MIS clerkship was inserted into his official evaluation stored in the OASIS system. The paragraph stated: *"Kevin did do a good job closing laparoscopic incision sites in the OR on several occasions with minimal direction. He also showed eagerness to scrub in and participate in closing in the OR."*

53.     This new information directly contradicted Dr. Billmeier's original evaluation, which had criticized Plaintiff's suturing skills and claimed he had failed to properly scrub in. The original evaluation contained no positive remarks.

54.     Only Drs. Billmeier, Crockett, and Sorensen had access to modify Plaintiff's online record. The new paragraph was inserted by Briana L. Smith, Dr. Crockett's secretary.

55.     The APC had no opportunity to consider this favorable information during the May 28 hearing, and none of the responsible faculty members—Drs. Crockett, Sorensen, or Billmeier—made any effort to submit or disclose the updated evaluation to the APC after the fact.

56.     Plaintiff discovered the newly inserted paragraph on June 17, 2024, while finalizing his appeal to Dean Compton. He included a copy of the updated evaluation and cited it as new exculpatory evidence in his appeal letter. Nevertheless, Dean Compton affirmed the APC's decision to separate Plaintiff.

57.     On July 15, 2024, Plaintiff presented his appeal and supporting evidence to the designated hearing committee. He left the meeting with the impression that his arguments had been positively received.

58.     However, the following day, after Dr. Crockett addressed the committee, the tone shifted dramatically, and the committee members reversed their posture, ultimately rejecting Plaintiff's appeal.

59.     On August 5, 2024, Plaintiff's final appeal was denied, and he was formally separated from Geisel without any further recourse.

60.     As a direct result of the foregoing conduct, Plaintiff's medical career was irreparably damaged. He was separated from Geisel during the final semester of his medical education. Plaintiff is now forced to restart his medical training at a lesser-known institution in the Caribbean Islands, representing a steep and unjust decline from his prior standing at an Ivy League medical school.

<u>COUNT I</u>
**DISCRIMINATION BASED ON RACE, COLOR, OR NATIONAL ORIGIN**
**(Trustees of Dartmouth College, Violation of Title VI, 42 U.S.C. § 2000d et seq.)**

61.     Plaintiff hereby repeats all of the allegations contained in the Complaint thus far above and incorporates same as if fully set forth at length herein.

62.     At all times relevant hereto, Trustees of Dartmouth College served as the governing body of Dartmouth College (the "College"), a private postsecondary institution of higher education and a "program or activity" as defined in 42 U.S.C. § 2000d–4a(2)(A), receiving federal financial assistance and thereby subject to Title VI of the Civil Rights Act of 1964.

63.     Dartmouth College, through its agents and employees, discriminated against Plaintiff on the basis of race, color, and national origin in violation of 42 U.S.C. § 2000d by permitting Drs. Crockett, Sorensen, and Billmeier to engage in disparate treatment of Plaintiff and by failing to take corrective action when Plaintiff raised these concerns during his appeals.

64.     Plaintiff explicitly informed Geisel School of Medicine ("GSOM") leadership of his belief that he was being mistreated due to his race, color, national origin, and gender, yet the College failed and refused to investigate or remedy the discriminatory conduct of Drs. Crockett and Billmeier.

65.    Specifically, Dr. Billmeier treated Plaintiff, a dark-skinned male of Indian descent, differently than a white female student, Angel Moore, by falsely claiming she was unable to accommodate any students during the final week of Plaintiff's Spring 2024 MIS clerkship. In reality, she did accommodate Ms. Moore during that same period, demonstrating intentional and pretextual exclusion of Plaintiff.

66.    The stated reason for Plaintiff's reassignment was false and pretextual and constitutes intentional discrimination under Title VI.

67.    Dr. Billmeier further discriminated against Plaintiff by calling security and having him escorted out of the 4C Surgery Division, claiming she felt "threatened" by his mere presence, despite Plaintiff making no attempt to approach or speak to her. This conduct was not based on any objective behavior but rather on racially charged assumptions.

68.    Dr. Billmeier then directed Dr. Crockett to bar Plaintiff from returning to the 4C unit for the remainder of his rotation. Plaintiff was denied access to essential clinical spaces and even prevented from retrieving his personal property, including his MacBook computer, due to being labeled a "security threat." Upon confrontation, Dr. Crockett later admitted that his directive was excessive and improperly communicated.

69.    Dr. Billmeier further discriminated against Plaintiff by falsifying her written evaluation of his performance, omitting positive observations of his suture skills and clinical contributions. After the APC voted to separate Plaintiff, Dr. Billmeier attempted to retroactively insert favorable comments into Plaintiff's record, only after being confronted with objective evidence—including a videotaped suture exam in which Plaintiff excelled. Notably, Plaintiff passed the exam while other students with more favorable written evaluations failed.

70.    Dr. Crockett knowingly assisted Dr. Billmeier in her discriminatory and misleading conduct by permitting his secretary, Briana L. Smith, to insert the positive comments into Plaintiff's OASIS record after the APC's decision, without notifying the committee or correcting the record in time for consideration.

71.    Plaintiff presented this evidence of intentional discrimination and record falsification to Dean Duane Compton, the highest-ranking official at GSOM. Despite having actual knowledge, Dean Compton acted with deliberate indifference by refusing to investigate, discipline, or reprimand Drs. Billmeier and Crockett, and by affirming the APC's decision to separate Plaintiff.

72.    The College's failure to act, and its deliberate indifference to known discrimination, were the direct and proximate cause of Plaintiff's separation from GSOM and the resulting damages, including the destruction of his medical career and loss of educational opportunity.

73.    Defendants' failure to investigate, correct, or prevent the discriminatory conduct of their agents—despite repeated notice and documented evidence—constitutes deliberate indifference under Title VI. The Trustees of Dartmouth College ratified this conduct through the actions of Dean Compton and the Academic Progress Committee, rendering the institution liable for intentional discrimination.

## <u>COUNT II:</u>
## DISCRIMINATION BASED ON DISABILITY
### (42 U.S. Code § 12182 - Prohibition of Discrimination by Public Accommodations)

74.    Plaintiff hereby repeats all of the allegations contained in the Complaint thus far above and incorporates same as if fully set forth at length herein.

75.     Subsection (a) of 42 U.S. Code § 12182 provides the following:

*No individual shall be discriminated against based on disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.*

76.     Subsection (b)(2)(A)(i) provides in relevant part that discrimination includes:

*the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;*

77.     By denying Plaintiff reasonable accommodations for his disability, Geisel School of Medicine at Dartmouth (GSOM) imposed or applied eligibility criteria that screened out Plaintiff, a qualified individual with a disability, from fully and equally enjoying the goods, services, facilities, privileges, advantages, and accommodations of the institution.

78.     By virtue of operating as a postsecondary educational institution, GSOM qualifies as a "public accommodation" under 42 U.S.C. § 12181(7)(J).

79.     As a public accommodation, GSOM is subject to the antidiscrimination provisions of the Americans with Disabilities Act (ADA), codified in Chapter 126 of Title 42 of the United States Code.

80.     Plaintiff was diagnosed with Major Depressive Disorder and provided GSOM with documentation sufficient to trigger its obligation to engage in the interactive process and provide reasonable accommodations. His condition substantially limited his ability to learn and concentrate, qualifying as a disability under 42 U.S.C. § 12102(1)(A).

81.    The major life activities impacted by Plaintiff's condition include, but are not limited to learning, reading, concentrating, thinking, communicating, and working, as defined in 42 U.S.C. § 12102(2)(A).

82.    Pursuant to 42 U.S.C. § 12102(4)(A), the term "disability" must be construed in favor of broad coverage, to the maximum extent permitted by law.

83.    GSOM was first made aware of Plaintiff's disability in 2021, when Plaintiff disclosed his diagnosis and requested reasonable accommodations. GSOM was again notified of Plaintiff's condition and request for accommodations on May 5, 2024, during the final stages of his clinical training.

84.    Despite repeated disclosures and requests, GSOM failed to provide meaningful accommodations, including failing to inform clinical preceptors of Plaintiff's condition, failing to adjust evaluative criteria, and failing to protect Plaintiff from biased assessments.

85.    By refusing to accommodate Plaintiff's disability, GSOM denied him the opportunity to participate in and benefit from the services, privileges, and advantages of its medical education program, in violation of 42 U.S.C. § 12182(b)(1)(A)(i).

86.    This discriminatory conduct was the direct and proximate cause of Plaintiff's inability to successfully complete his surgery clerkship and ultimately led to his dismissal from the program, causing substantial educational, professional, and emotional harm.

87.    Defendants failed to engage in the interactive process required under the ADA, including meaningful dialogue with Plaintiff regarding his disability-related needs. Their refusal to inform clinical preceptors of Plaintiff's condition and failure to adjust evaluative criteria denied Plaintiff equal access to the educational services and privileges offered by GSOM.

## COUNT III
### DISCRIMINATION IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973
### (Against Trustees of Dartmouth College – 29 U.S.C. § 701 et seq.)

88.    Plaintiff hereby repeats all of the allegations contained in the Complaint thus far above and incorporates same as if fully set forth at length herein.

89.    At all times relevant hereto, Geisel School of Medicine at Dartmouth (GSOM) was a "program or activity receiving Federal financial assistance" within the meaning of 29 U.S.C. § 794(b)(2)(A). As such, GSOM was subject to the requirements of Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. §§ 701 et seq.

90.    Plaintiff informed GSOM of his disability and requested reasonable accommodations for his diagnosed conditions, including Crohn's disease, migraine exacerbated by COVID-19, and Major Depressive Disorder.

91.    GSOM refused to provide the requested accommodations, including but not limited to informing clinical preceptors of Plaintiff's condition, adjusting evaluative criteria, and protecting Plaintiff from biased assessments.

92.    The accommodations requested by Plaintiff would not have imposed a substantial financial or administrative burden on GSOM and were reasonable under the circumstances.

93.    At all times relevant, Plaintiff was a qualified individual with a disability as defined in 29 U.S.C. § 705(20)(B) and further clarified in 42 U.S.C. § 12102(1). His condition substantially limited one or more major life activities, including learning, concentrating, and working.

94.    By refusing to accommodate Plaintiff after being notified of his disability, GSOM discriminated against Plaintiff on the basis of disability in violation of 29 U.S.C. § 794(a).

95.     As a result, GSOM excluded Plaintiff from participation in, denied him the benefits of, and subjected him to discrimination under a federally funded educational program, in violation of Section 504.

96.     Intentional discrimination is not required to establish liability under Section 504. Defendants' failure to provide reasonable accommodations—despite actual knowledge of Plaintiff's disability—constitutes unlawful exclusion and denial of benefits under a federally funded program.

97.     Plaintiff seeks compensatory damages, attorney's fees, and costs of litigation pursuant to 29 U.S.C. § 794a.

## COUNT IV:
## BREACH OF CONTRACT

98.     Plaintiff hereby repeats all of the allegations contained in the Complaint thus far above and incorporates same as if fully set forth at length herein.

99.     Dartmouth College, through its division Geisel School of Medicine (GSOM), entered into an implied contract with Plaintiff, pursuant to which Plaintiff agreed to pay all required tuition and fees and to successfully complete the academic and clinical requirements necessary to earn the degree of Doctor of Medicine. In exchange, Defendants agreed to provide instruction, testing, facilities, programs, curricula, and institutional support in accordance with established policies and standards.

100.    Plaintiff's implied contract with Defendants incorporated GSOM's published policies, procedures, and remediation assurances. Defendants breached this contract by failing to follow their own guidelines regarding remediation, evaluation, and procedural fairness, and by allowing biased faculty to influence academic outcomes without oversight or correction.

101.    Defendants breached this implied contract by engaging in and permitting intentional discrimination against Plaintiff on the basis of his race, color, national origin, and sex, thereby depriving him of a fair and unbiased educational experience.

102.    Specifically, Defendants breached the contract by allowing Dr. Billmeier, a clinical preceptor, to treat Plaintiff—a dark-skinned male of Indian heritage—differently than a white female student, and to submit a biased and discriminatory evaluation of Plaintiff's performance during the Minimally Invasive Surgery (MIS) rotation in April 2024. This evaluation was the primary basis for Plaintiff's separation from the program.

103.    Defendants further breached the implied contract by permitting Dr. Billmeier to fraudulently withhold favorable observations of Plaintiff's suturing skills, and later insert those positive remarks into Plaintiff's academic record after the Academic Progress Committee (APC) had already voted to separate him. This conduct violated the College's duty to maintain accurate, timely, and fair academic records.

104.    The foregoing breaches were a substantial factor in causing the damages alleged herein, including Plaintiff's separation from GSOM, the loss of his medical degree opportunity, and the resulting harm to his professional and educational future.

105.    As a direct and proximate result of Defendant's actions, Plaintiff suffered economic, emotional, incidental, and consequential damages as will be proved at the trial of this cause in an amount in excess of the jurisdictional limits of this Court.

106.    As a direct and proximate result of Defendant's actions, Plaintiff suffered emotional stress with associated physical problems, future loss of earning capacity, loss of tuition paid prior

to his dismissal from the medical program, additional tuition paid at other medical schools where he had to enroll after being dismissed by the Defendant, and other damages not presently known.

<u>**COUNT V**</u>
**Promissory Estoppel**

107.    Plaintiff hereby repeats all of the allegations contained in the Complaint thus far above and incorporates same as if fully set forth at length herein.

108.    Defendants, through their agents and representatives at Geisel School of Medicine (GSOM), made clear and definite promises to Plaintiff that he would be permitted to complete his medical education and earn his degree provided he satisfied the academic and clinical requirements of the program.

109.    Plaintiff reasonably and detrimentally relied on these promises by:

   a.    Paying all required tuition and fees;

   b.    Completing coursework and clinical rotations;

   c.    Undertaking additional remediation efforts at the request of GSOM faculty;

   d.    Disclosing his disability and seeking accommodations in good faith;

   e.    Participating in evaluations and hearings under the belief that he would be treated fairly and in accordance with institutional policies.

110.    Defendants made further implicit and explicit assurances that Plaintiff's remediation of his Pediatrics clerkship and Shelf Exam would be sufficient to restore his standing, and that evaluations would be conducted fairly and without bias.

111.    Plaintiff's reliance was reasonable and foreseeable, given GSOM's status as a professional institution of higher learning and the repeated representations made by faculty and administrators regarding remediation, evaluation, and graduation eligibility.

112.    Plaintiff's reliance was induced by repeated representations from GSOM faculty and administrators, including Drs. Crockett, Dick, and Chimienti, that remediation efforts would restore his academic standing and that evaluations would be conducted fairly. Defendants knew or should have known that Plaintiff would rely on these assurances to his detriment.

113.    Despite Plaintiff's reliance and substantial performance, Defendants failed to honor their promises, instead allowing discriminatory and procedurally flawed evaluations to dictate his separation from the program.

114.    As a result, Plaintiff suffered significant harm, including the loss of his medical degree opportunity, reputational damage, emotional distress, and the need to restart his education at a lesser institution.

115.    Plaintiff seeks equitable relief, including damages and any other remedy the Court deems just and proper, to redress the harm caused by Defendants' failure to honor their promises.

## COUNT VI
## PROCEDURAL DUE PROCESS VIOLATION

116.    Plaintiff hereby incorporates all preceding paragraphs as though fully set forth herein.

117.    As a private educational institution, Dartmouth College—through its division Geisel School of Medicine—owes its students a duty to conduct disciplinary and academic

proceedings in a manner that is fundamentally fair, consistent with its own policies, and in accordance with principles of procedural justice recognized under New Hampshire law.

118.    Plaintiff had a protected interest in continuing his medical education and completing his degree, having invested substantial time, tuition, and academic effort toward graduation. Defendants' decision to separate Plaintiff from the program constituted a severe deprivation of that interest.

119.    Defendants failed to provide Plaintiff with adequate procedural safeguards prior to his separation, including:

    a.  Failure to provide timely and specific notice of the charges or concerns leading to the hearing;

    b.  Failure to inform Plaintiff that separation was a possible or likely outcome of the May 28, 2024 APC hearing;

    c.  Refusal to allow Plaintiff's witnesses—including Drs. Del Giudice and Dick—to testify or submit favorable evidence;

    d.  Conducting a hearing that lasted no more than ten minutes, during which no committee member asked Plaintiff any questions;

    e.  Relying on biased and incomplete evaluations, including Dr. Billmeier's negative review submitted after she had excused herself from working with Plaintiff;

    f.  Failing to consider newly inserted favorable evidence in Plaintiff's OASIS record, which contradicted the basis for separation;

g.  Allowing faculty members with known bias to influence the committee's decision without recusal or oversight.

120.    Defendants' failure to follow their own internal procedures and to provide Plaintiff with a meaningful opportunity to respond to allegations and present evidence violated the implied contractual duty of good faith and fair dealing, as well as common law principles of procedural fairness applicable to private educational institutions.

121.    These procedural deficiencies were not isolated or technical but constituted a pattern of disregard for Plaintiff's rights, culminating in an arbitrary and capricious decision to separate him from the program.

122.    As a direct and proximate result of Defendants' denial of procedural due process, Plaintiff suffered substantial harm, including the loss of his medical degree opportunity, reputational damage, emotional distress, and the need to restart his education at a lesser institution.

123.    Plaintiff seeks compensatory damages, equitable relief, and any other remedy the Court deems just and proper to redress the harm caused by Defendants' failure to provide fair process.

## ATTORNEY'S FEES AND COSTS

124.    As a direct result of the actions of the s heretofore mentioned, Plaintiff was forced to retain the undersigned counsel and expend attorney's fees, litigation expenses, and costs of court. Pursuant to 42 U.S.C. § 1988, Plaintiff hereby requests that the Court order Defendant to pay Plaintiff's reasonable and necessary attorney's fees and costs of court.

## PRAYER FOR RELIEF

125.    **WHEREFORE**, Plaintiff KEVIN S. KANG respectfully requests that this Court enter judgment in his favor and against TRUSTEES OF DARTMOUTH COLLEGE, and award the following relief:

A) Compensatory damages for the destruction of Plaintiff's medical career, including lost educational opportunity, future earning capacity, emotional distress, reputational harm, and consequential damages arising from his separation from Geisel School of Medicine;

B) Restitution of tuition and fees paid to Dartmouth College, and reimbursement of additional tuition and costs incurred at other institutions due to Defendants' unlawful conduct;

C) Equitable relief, including but not limited to expungement of adverse academic records, reinstatement (if feasible), or declaratory judgment that Plaintiff's separation was unlawful;

D) Reasonable attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 794a, and other applicable statutes;

E) Pre- and post-judgment interest as permitted by law;

F) Such other and further relief as the Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

126.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all issues so triable.

## CERTIFICATION

127.    Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully Submitted,

Dated: October 20th 2026.

*/S/ William R. Granfield*
*Granfield Legal Services*
*212 Coolidge Ave*
*Manchester NH 03102*
*NH BAR ID: 279723*
*Attorney for Plaintiff*